[816 NYS2d 470]

RICHBELL INFORMATION SERVICES, INC., et al., Plaintiffs, v JUPI-
TER PARTNERS L.P. et al., Defendants. JUPITER PARTNERS
L.P. et al., Counterclaim Plaintiffs-Respondents, v RICHBELL
INFORMATION SERVICES, INC., et al., Counterclaim Defen-
dants, and DAVID M.A. ELIAS, Counterclaim Defendant-
Appellant.

First Department, June 13, 2006

## APPEARANCES OF COUNSEL

*Epstein & Weil*, New York City (*Judith H. Weil* and *Lloyd Epstein* of counsel), for appellant.

*Paul, Weiss, Rifkind, Wharton & Garrison LLP* (*Allan J. Arffa* and *Farrah R. Berse* of counsel), for Jupiter Partners L.P., and others, respondents.

*Morrison & Foerster LLP*, New York City (*Michael B. Miller* of counsel), and *Sullivan & Cromwell LLP*, New York City (*Robert M. Osgood* of counsel), for RIT Capital Partners PLC, respondent.

*Reed Smith LLP*, New York City (*Robert J. Miller* of counsel), for Ernest Saunders, respondent.

## OPINION OF THE COURT

CATTERSON, J.

At the time the instant action was commenced in 1997, then plaintiff (now counterclaim defendant) David M.A. Elias was a citizen of the United Kingdom living in Ireland. Elias was a principal of plaintiffs Richbell Information Services, Inc. and the Richbell Group Limited. In March 2002, Elias moved to Labuan, Malaysia. This Court dismissed Elias' individual claims in 2003. (*Richbell Info. Servs. v Jupiter Partners*, 309 AD2d 288, 306-307 [1st Dept 2003].)

In January 2005, defendants/counterclaim plaintiffs (hereinafter referred to collectively as Jupiter Partners) attempted to take Elias' deposition. Elias invoked the secrecy provisions of the Malaysia Offshore Companies Act 1990 (hereinafter referred to as the Act) in response to questions respecting:

- what he does for a living;

- what industry or type of business he is involved in;

- his current business address;

- the name of his employer;

- whether he created the company;

- his position at the company;

- whether he holds an ownership interest in the company;

- what the company does;

- how long he has been at the company;

- whether there are other employees at the company;

- whether any of the investors in Richbell are also investors of the company;

- whether anyone who was affiliated with any of the Richbell entities works at the company;

- whether the company has interests in other businesses.

Elias did say that the company was his sole employer and that he had no business interests besides the company. He also said that the company for which he worked had no relationships with any of the Richbell entities. Finally, he said that he was unemployed from 2001 until he started his current employment.

Jupiter Partners then moved to compel Elias to answer questions about his current employment. Judicial Hearing Officer (J.H.O.) Beverly S. Cohen ordered Elias to answer the questions as posed and that order was upheld by the motion court. That decision was largely in error because the scope of the Act precludes such discovery.

Section 149 (3) of the Act (Malaysia Act 441.149) states:

> "A person who, with respect to any offshore company or foreign offshore company, otherwise than for the purpose of the administration of this Act or the carrying on of the business of the company, in Labuan or elsewhere—
>
> "(a) divulges . . .
>
> "(c) . . . any information concerning or touching upon—
>
> "(d) the shareholding in, or beneficial ownership of, any share or shares in such company;
>
> "(e) the management of such company; and

"(f) any of the business, financial or other affairs or transactions of the company,

shall be guilty of an offence against this Act."

The penalty for an offense against the Act is a fine not exceeding 5,000 ringgit (about $1,300).

Section 149 (4) states: "Nothing in this section shall prevent any Court from exercising its discretion to require any person to produce any document or to give any evidence in any proceedings before the Court which is relevant to those proceedings." "Court" is defined in the Act as "the High Court or a judge thereof." (Malaysia Act 441.2.) "High Court" means the High Court of Malaysia or the High Court of Sabah and Sarawak in Malaysia.

Section 150 of the Act (Malaysia Act 441.150) states:

"The Minister [of Finance] may, on the recommendation of the Registrar [i.e. the Labuan Offshore Financial Services Authority (hereinafter referred to as LOFSA)] . . . exempt any offshore company or foreign offshore company or any person or class of persons or class of offshore companies or foreign offshore companies from any of the provisions of this Act."

Both sides submitted affidavits from Labuan lawyers prior to the hearing before J.H.O. Cohen. Jupiter Partners' expert, Matthew Willie, asserted that the Act permitted Elias to disclose the name and address of his current employer, how long he has worked for the company, his position, and the details of his compensation. Willie admitted that the other information requested by Jupiter Partners might fall within the Act's secrecy provisions, but he said that Elias could seek the consent of his employer and/or LOFSA to reveal that information. Finally, Willie said that, to his knowledge, the Act had not been enforced.

Elias' expert, Leonard Foo Tet Seong, asserted that Elias could not divulge any information whatsoever about a Labuan offshore company, including its name and address. He stated:

"Particularly in any age of electronic information, disclosure of virtually any information about a company, including its purposes, investors, or its name and address can 'concern or touch on' 'the business, financial or other affairs or transactions of the company.' [see Section 149 (3) (f)]. Similarly,

how long Mr. Elias has worked in the company, his position there and details of his remuneration or compensation are all employment-related matters concerning or touching upon the management of the company. [see Section 149 (3) (e)]." (Brackets in original.)

Foo explained that Malaysia had an interest in promoting Labuan as an international offshore financial center and "ensuring that Labuan maintains its reputation as a secure environment for foreign investment." He said that the Act "was promulgated by the Malaysian government to foster international investment by protecting the privacy and security of investors and investments in Labuan offshore companies."

Foo was "not aware of anyone who has contravened Section 149 (3) and not been prosecuted." However, this might be because "the legislation has never been breached." Foo pointed out that a monetary penalty was not the only adverse consequence Elias might face. He stated, "Mr. Elias is a resident, but not a citizen of Malaysia. His employment is dependent upon his ability to obtain a work permit issued by the Immigration Department. Conviction of an offense under the . . . Act . . . could adversely impact on Mr. Elias' ability to maintain or renew his work permit."

Foo acknowledged that Elias could ask his employer for permission to disclose information about it. However, he added, "it seems . . . unlikely that the company would place its ability to conduct business at risk merely to accommodate a lawsuit in which it has no interest."[1] He further stated that, in his opinion, "it is unlikely that the Minister would grant . . . an exemption in this case."

### Decision of the Judicial Hearing Officer

J.H.O. Cohen held that the Act "does not protect Elias from an order that he . . . answer all appropriate questions." Despite the explicit definition of "Court" in the Act, the J.H.O. believed that she qualified as a "Court" under section 149 (4). The J.H.O. further stated:

"Most important in reaching my conclusion (that

---

**1.** Foo believed there was "a substantial risk that the requested disclosure could . . . be detrimental to the company's ability to carry out its business" in light of "evidence that the defendants have interfered with the business and other affairs of companies with which Elias has been associated."

Elias must answer questions) are the facts that (1) Elias on behalf of Richbell entities has chosen to initiate an action in New York State and therefore cannot expect to limit his participation to an extent not consistent with New York laws governing pretrial discovery; and (2) Elias cannot invoke the protection of arcane laws of a foreign jurisdiction where he has chosen to reside, and thereby surround himself with a protective covering. To permit this would be unfair to defendants in our courts and would encourage hit and run behavior by plaintiffs."

Elias moved to vacate the J.H.O.'s order, which was denied by the motion court. The court held that if a Malaysian court had discretion to order disclosure, it had such discretion, too. Furthermore, the court found that Elias' answers "may be material and necessary." This Court stayed further discovery of Elias.

Jupiter Partners contends that this Court should defer to the motion court because the instant appeal concerns discovery. However, the IAS court's discretion in the context of disclosure is reviewable by this Court, which, even in the absence of abuse, may substitute its own discretion. (*Andon v 302-304 Mott St. Assoc.*, 94 NY2d 740, 745 [2000]; *see also Matter of New York County DES Litig.*, 171 AD2d 119, 124 [1st Dept 1991].)

### General Standards re: International Discovery

In all cases involving international discovery, the court:

"should take into account the importance to the . . . litigation of the . . . information requested; the degree of specificity of the request; whether the information originated in the United States;[2] the availability of alternative means of securing the information; and the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located." (Restatement [Third] of Foreign Relations Law § 442 [1] [c]; *see also Societe Nationale Industrielle Aero-*

---

**2.** This factor has been interpreted to mean the location of the information to be disclosed and the people who will be deposed. (*Richmark Corp. v Timber Falling Consultants*, 959 F2d 1468, 1475 [9th Cir 1992], *cert dismissed* 506 US 903 [1992].)

*spatiale v United States Dist. Court for Southern Dist. of Iowa,* 482 US 522, 544 n 28 [1987], quoting 1986 Tentative Draft No. 7 of Restatement of Foreign Relations Law § 437 with approval.)

When a conflicting foreign statute such as the Act exists, courts also consider, inter alia, the good faith of the party resisting discovery (*see In re Grand Jury Subpoena dated Aug. 9, 2000,* 218 F Supp 2d 544, 554 [SD NY 2002], *affd* 318 F3d 379 [2d Cir 2002]); the hardship of compliance on the party from whom discovery is sought (*id.; see also Intercontinental Credit Corp. Div. of Pan Am. Trade Dev. Corp. v Roth,* 152 Misc 2d 751, 756 [Sup Ct, NY County 1990]); the nationality of the person who must provide the information (*see e.g.,* 218 F Supp 2d at 554; *United States v Rubin,* 836 F2d 1096, 1101 [8th Cir 1988]); whether the party resisting discovery is the plaintiff (*see e.g. Compagnie Francaise d'Assurance Pour le Commerce Exterieur v Phillips Petroleum Co.,* 105 FRD 16, 32 [SD NY 1984]); and, the amount of discovery already provided (*Minpeco, S.A. v Conticommodity Servs., Inc.,* 116 FRD 517, 528-529 [SD NY 1987]; *cf. Compagnie Francaise,* 105 FRD at 31-32).

### Materiality versus Conflict with Foreign Law

Elias contends that this Court should first consider materiality. Jupiter Partners contends that this Court should first consider whether the Act actually bars the disclosure that it seeks. (*See e.g. Graco, Inc. v Kremlin, Inc.,* 101 FRD 503, 510 [ND Ill 1984].)

Elias is correct for two reasons. First, even if this were a purely domestic dispute, and there were no conflicting foreign law, Jupiter Partners would be entitled to discovery only if the disclosure sought were "material and necessary." (CPLR 3101 [a].) Second, US courts have experience in deciding what is material or relevant, but they have considerably less expertise in delineating the scope of a foreign law. (*See e.g. Richmark,* 959 F2d at 1474 n 7.)

### Standard of Relevance in International Discovery

It is well known that the scope of American discovery is often significantly broader than is permitted in other jurisdictions. (*Aerospatiale,* 482 US at 542.) Therefore, a number of courts as well as the Restatement have said that a more stringent test should apply in international discovery than in purely domestic discovery. (*See e.g. In re Uranium Antitrust Litig.,* 480 F Supp

1138, 1146 [ND Ill 1979]; *Societe Internationale pour Participations Industrielles et Commerciales, S. A. v Rogers*, 357 US 197 [1958] [normal discovery standard of whether a document is relevant or is calculated to lead to the discovery of admissible evidence does not apply, and should be replaced by the higher standard of whether the requested documents are crucial to the resolution of a key issue in the litigation]; *see also Richmark*, 959 F2d at 1475 [where the outcome of litigation does not "stand or fall" on the present discovery order, courts are generally unwilling to override foreign secrecy laws]; Restatement [Third] of Foreign Relations Law § 442, Comment *a* [before issuing an order for production of information located abroad, the court should scrutinize a discovery request more closely than it would a request for information located in the US]; *but see Compagnie Francaise*, 105 FRD at 32 n 8; *Graco*,101 FRD at 515.)

Comity also requires a heightened standard of relevance. (*In re Vitamins Antitrust Litig.*, 2001 WL 1049433, *10 n 20, 2001 US Dist LEXIS 8904, *56 n 20 [DC Cir 2001] [significant comity concerns of requiring disclosure that could violate foreign countries' laws require showing that the requested discovery is necessary].)

## The Requested Information is not Crucial or Relevant

Elias correctly contends that the information sought by Jupiter Partners is neither material nor necessary. All of the parties' claims concern events that took place solely between 1994 and 1998. What Elias does now is of no relevance to this lawsuit.

Jupiter Partners argue that Elias' present employment is relevant because they have accused him of a Ponzi scheme. They suggest that he may currently be engaged in similar schemes. However, "the character of a party may not be shown in a civil case to raise an inference that he acted in conformity therewith on the occasion in question." (*O'Connell v Jacobs*, 181 AD2d 1064, 1065 [4th Dept 1992] [internal quotation marks and citation omitted], *affd* 81 NY2d 797 [1993].)

Jupiter Partners further assert that Elias' current employment is also relevant to the question of his credibility or bias. However, there are better means of showing this in the context of the actual claims in the case rather than Elias' actions almost a decade after the events that gave rise to the instant dispute (e.g., if Elias' testimony about the transactions at issue contradicts written documents).

In sum, because Jupiter Partners' questions about Elias' current employment are irrelevant to the underlying lawsuit, the order appealed is reversed in part. (*See Trade Dev. Bank v Continental Ins. Co.*, 469 F2d 35, 40-41 [2d Cir 1972]; *Graco*, 101 FRD at 528-530 [sustaining some of foreign party's objections on relevance grounds]; *see also Matter of Two Grand Jury Subpoenas Duces Tecum [Union Bank of Switzerland]*, 158 Misc 2d 222, 226 [Sup Ct, NY County 1993] [subpoena quashed because, inter alia, subpoenaed information was not crucial].)

### Whether Foreign Law Prohibits the Requested Disclosure

Jupiter Partners contend that the Act does not prohibit all of the disclosure they seek. They are partly correct.

Elias need not identify the company that he works for, but he would not violate the Act by stating, in general terms, what he does for a living, for example, "banker," "stockbroker," "lawyer," and what industry or type of business he is involved in, for example, "oil extraction."

Nonetheless, some of Jupiter Partners' questions clearly fall afoul of the Act. Such inquiries include whether Elias holds an ownership interest in the company and whether any of the investors in Richbell are also investors in the company (*see* Act § 149 [3] [d]); what the company does; whether it has interests in other businesses; whether Elias created the company; whether there are other employees of the company, and whether anyone affiliated with Richbell works at the company (*see* § 149 [3] [f]); and if Elias happens to be a manager, what his position is (*see* § 149 [3] [e]).

The name and address of the company fall into a gray area. At first glance, such information would not seem to fall within section 149 (3) (d)-(f). However, Elias' expert put forth a credible argument that investors in Labuan offshore companies greatly value their privacy, and that divulging Elias' current employer might drag it into litigation in which it has no interest.

Relying on lists of trust companies, insurance companies, offshore leasing companies, and offshore banks that are available on LOFSA's Web site, Jupiter Partners argues that Labuan does not value privacy as much as Elias contends. This argument is unavailing. First,

> "It is a requirement under the [Act] that an offshore company must employ the services of a trust com-

pany, which is a company . . . registered under the Labuan Trust Companies Act 1990 . . . . The trust company provides the registered office, Resident Secretary and performs the secretarial duties of the offshore company . . . and also makes available any of its Trust Officer [*sic*] for appointment as Resident Director." (LOFSA, *About Offshore Companies*, available at <http://www.lofsa.gov.my/lofsa5/labiofc/ offco/offco.htm>, cached at <http://www. courts. state.ny.us/reporter/webdocs/Labuan_IOFC_About_ Offshore_Companies.htm>)

Thus, trust companies are the public face of offshore companies and the fact that a trust company's name and address are publicly available does not mean that the underlying offshore company's name and address are publicly available.

Second, "banking, insurance and insurance-related businesses, fund management, leasing, factoring and company management would require the offshore company to be licensed." (*Id.*) Therefore, the fact that insurance companies, offshore leasing companies, and offshore banks are listed on LOFSA's Web site does not mean that the names and addresses of other types of offshore companies would be publicly available.

Therefore, Elias is required to state only what he does for a living and in what industry or type of business he is involved. Elias is permitted to do this in writing, since it takes 24 hours to travel from Labuan to New York and Elias has already been deposed in New York for nine days. It would not contribute to the "speedy and inexpensive determination" of this action (CPLR 104) to compel him to come to New York again just to answer two questions. The US Supreme Court has warned:

> "American courts, in supervising pretrial proceedings, should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position. . . . For example, the additional cost of transportation of documents or witnesses to or from foreign locations may increase the danger that discovery may be sought for the improper purpose of motivating settlement, rather than finding relevant and probative evidence." (*Aerospatiale*, 482 US at 546.)

Accordingly, the order of the Supreme Court, New York County (Karla Moskowitz, J.), entered October 11, 2005, which

denied Elias' motion to vacate an order of J.H.O. Beverly S. Cohen, dated June 21, 2005, which ordered him to answer certain questions at his deposition, should be reversed, on the law and the facts, without costs, except to the limited extent of ordering Elias to answer in writing the two questions delineated herein.

SAXE, J.P., MARLOW, SULLIVAN and GONZALEZ, JJ., concur.

Order, Supreme Court, New York County, entered October 11, 2005, reversed, on the law and the facts, without costs, except to the limited extent of ordering Elias to answer in writing the two questions delineated in this opinion.